UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                            :
                                                  :
        TELIGENT, INC.,                           :          Chapter 11
                                                  :          Case No. 01-12974(SMB)
                Reorganized Debtor.               :
------------------------------------------------------X
SAVAGE & ASSOCIATES, P.C., as                     :
Unsecured Claims Estate Representative            :
of TELIGENT, INC.,                                :
                                                  :
                Plaintiff,                        :          Adv. Proc. No. 03-2523
                                                  :
        -- against --                             :
                                                  :
ALEX MANDL,                                       :
                                                  :
                Defendant.                        :
------------------------------------------------------X

## MEMORANDUM DECISION REGARDING THE PRECLUSION
## OF EXPERT REPORTS AND OTHER DISCOVERY ISSUES

**A P P E A R A N C E S:**

SAVAGE & ASSOCIATES, P.C.
Attorneys for Plaintiff
P. O. Box 804
Croton on Hudson, New York 10520-0804

        Denise L. Savage, Esq.
                Of Counsel


KIRKPATRICK & LOCKHART LLP
Attorneys for Defendant
599 Lexington Avenue
New York, New York 10022

        Robert N. Michaelson, Esq.
        Judith Sturtz Karp, Esq.
                Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The plaintiff commenced this adversary proceeding against Alex Mandl primarily to recover a constructive fraudulent transfer. This opinion resolves certain disputes between the parties concerning the recent production of three additional expert reports, the use of documents that the plaintiff acquired from an executive search firm, SpencerStuart, and the plaintiff's cross-motion for sanctions arising from Mandl's failure to comply with the Federal Rules of Civil Procedure and certain orders of this Court. As explained in detail below, (1) the expert reports and related testimony will be precluded, (2) the SpencerStuart documents will not be precluded absent a specific showing that the documents contain information that merits protection against use and disclosure, and (3) the plaintiff's cross-motion for sanctions is denied, except that Mandl is directed to search through and turn over any relevant documents in the personnel file maintained by his current employer.

## BACKGROUND

### A.    Introduction

The background to this dispute is discussed in the Court's previous decisions reported at 325 B.R. 81 (the "Mandl I"), 325 B.R. 134 ("Mandl II") and 346 B.R. 73 ("Mandl III"), familiarity with which is assumed. In brief, Mandl was, until his employment by Teligent, the President and Chief Operating Officer of A T & T. On or about August 19, 1996, he entered into an employment agreement (the "Employment Agreement") with Teligent (f/k/a Associated Communications, L.L.C.), effective September 1, 1996, to serve as Teligent's Chairman and Chief Executive Officer.

Pursuant to ¶ 4(f) of the Employment Agreement, the original shareholders, Microwave Services, Inc. and Digital Services Corporation, agreed to loan Mandl $15 million. The Employment Agreement provided, inter alia, that the loan would be forgiven if Teligent terminated Mandl "other than for Cause" or he resigned "for Good Reason" prior to the fifth anniversary of the Employment Agreement, or September 1, 2001. The promissory notes were subsequently assigned to Teligent.

In April 2001, IDT Corporation bought a significant equity stake in Teligent. On or about April 27, 2001, Teligent and Mandl entered into a written agreement (the "Separation Agreement"), which, by its terms, terminated his employment "other than for Cause." The Separation Agreement also contained mutual releases. The release and the form of termination ("other than for Cause") relieved Mandl of the obligation to repay the outstanding balance of the loan, which then stood at $12 million. The Separation Agreement also restructured the forgiveness of the loan. The remaining balance was forgiven in 20 equal annual installments of $600,000 to minimize Mandl's income tax liability. The 2001 loan forgiveness and release are hereinafter referred to collectively as the Forgiveness.

Teligent filed its chapter 11 petition on May 21, 2001, less than one month after Mandl's termination, and confirmed a liquidating plan (the "Plan") on September 6, 2002. The plaintiff was appointed under Teligent's confirmed plan to prosecute Teligent's chapter 5 causes of action for the benefit of the unsecured creditors. Al other causes of action vested in Reorganized Teligent. The plaintiff commenced this adversary proceeding on April 25, 2003, filed an amended complaint on May 16, 2003, and thereafter obtained leave of the Court to file and serve a second amended complaint,

which she did on or about March 14, 2004.[1]  Aside from certain unrelated preference

claims, the gravamen of the pleadings appeared to conflate two transactions -- the 1996

loan and the 2001 Forgiveness – and allege that they formed a single constructive

fraudulent transfer.  During the October 5, 2006 oral argument held in connection with

the plaintiff's motion for a temporary restraining order, the plaintiff represented that she

was not challenging the 1996 loan, and her action was limited to the Forgiveness.

**B.**      **The Initial Discovery**

The plaintiff commenced nearly 1,000 avoidance actions, including this one, at

approximately the same time.  On or about August 29, 2003, the Court entered an

identical scheduling order in each adversary proceeding.  The scheduling order included

the following provisions:

1.  "[A]ll fact discovery (including, but not limited to, initial disclosures, document requests, interrogatories, requests for admissions and notices of deposition) must be served by the Parties on before December 1, 2003."

2.  "[A]ll fact discovery shall be concluded by the Parties on or before February 16, 2004."

3.  "[A]ll expert discovery (including, but not limited to, expert disclosures, expert deposition notices and expert reports) must be served by the Parties on or before March 1, 2004."

4.  "[A]ll expert discovery shall be concluded by the Parties on or before April 23, 2004."

Discovery in this adversary proceeding was briefly extended to accommodate

Mandl's deposition (it took place on March 5, 2004), but the parties completed their pre-

trial discovery without bringing any problems to the Court's attention.  In addition, the

plaintiff served an expert report on or before March 1, 2004.  She designated Alan

Barbee, CPA, of Barbee & Associates, CPA, as her trial expert.  According to the

---

[1]      In <u>Mandl III</u>, the Court denied the plaintiff's motion for leave to amend the complaint for a third time.

plaintiff's representation made at an October 5, 2006 hearing, the Barbee Report was limited to the opinion that Teligent was insolvent during the 90 days preceding the filing of the petition. Mandl did not serve any expert reports.

**C.      The Motions**

In December 2004, Mandl filed a motion for summary judgment and the plaintiff cross-moved for partial summary judgment. In the main, the motions raised the question of whether the Forgiveness was a "transfer" within the meaning of the Bankruptcy Code. In Mandl I, the Court answered the question in the affirmative, denied Mandl's motion for summary judgment, and granted the plaintiff's motion for partial summary judgment.

The Court observed in the course of the decision that although the Forgiveness was a "transfer," substantial fact questions remained. In particular, the evidence suggested that the Forgiveness did not transfer anything of value if the loan had already been forgiven, or Mandl had the right to declare that it be forgiven, under the terms of the Employment Agreement. The Court did not make any findings on these questions; instead, Mandl I concluded:

> Further proceedings are necessary to fix the value of the right at issue at the time of the Separation Agreement, and in the event that the right had value, to determine whether Teligent received fair consideration or reasonably equivalent value.

325 B.R. at 88.

The plaintiff moved for reargument in April 2005. In Mandl II, the Court granted limited reargument, but adhered to its original decision. Following the decision in Mandl II, the plaintiff filed a notice of appeal and a motion for leave to appeal on July 25, 2005. That motion was denied by the District Court in early February 2006.

**D.     The New Wave of Discovery**

The plaintiff viewed the Court's observations in <u>Mandl I</u> as new "Opinion

Defenses," which, together with another defense raised by Mandl, constituted "New

Defenses."  By letter dated February 6, 2006, she wrote requesting a discovery

conference.  (ECF Doc. # 70.)  The plaintiff sought to reopen discovery to inquire into

the "New Defenses," to wit, (1) whether Mandl resigned for Good Cause, (2) whether a

"Change in Control" had occurred, (3) whether a resignation for Good Cause was the

functional equivalent of a termination "other than for cause," (4) whether Teligent's right

to collect the loan terminated prior to the Separation Agreement, and (5) whether Teligent

had constructively discharged Mandl.

The Court conducted a discovery conference on February 8, 2006.  According to

the transcript of the conference ("Tr.") (ECF Doc. # 2360, filed in case no. 01-12974), the

plaintiff reiterated her need for discovery into the "New Defenses," and asked for three

additional months.  (Tr. at 5-6.)  She explained that she wanted to take Mandl's

deposition again.  She also wanted to depose two reporters who had interviewed Mandl

about the circumstances surrounding his departure from Teligent, and wrote articles,

available through the Internet, that either quoted or attributed certain statements to

Mandl.  Finally, she wanted to depose Howard Jonas, the Chief Executive Officer of IDT.

(<u>Id.</u> at 7-8.)

I granted the plaintiff's request over Mandl's objection, reopened the discovery to

inquire into the "New Defenses," and adjourned the matter for thirty days, at which time

the parties were directed to report on the status of the discovery.  Mandl sought

reargument in a letter to the Court dated Feb. 16, 2006.  (ECF Doc. # 71.)  He contended,

in substance, that the "New Defenses" were always part of the case, the plaintiff had

already questioned Mandl extensively about the circumstances surrounding his departure

from Teligent, and the news articles had been written in 2001.  The plaintiff responded

that she would be prejudiced if she were not allowed to conduct discovery regarding the

"New Defenses."  (ECF Doc. # 73.)

     The Court granted the motion for reargument, and took the opportunity to

emphasize the limited nature of the additional discovery:

> The issue of what actually happened is not the same as what could have
> happened. The Separation Agreement indicates that Mandl was terminated
> "other than for Cause." But Mandl might have had the right to quit for
> "Good Reason," or his obligation to repay might have been discharged
> under the "Change of Control." Accordingly, <u>the plaintiff should be
> entitled to examine into the issues relating to the value of the obligation
> that Teligent released</u>."

(<u>See</u> <u>Memorandum Endorsement and Order Granting Reargument and Clarifying the

February 8, 2006 Bench Order</u>, dated Feb. 27, 2006)(ECF Doc. # 74) (Emphasis added.)

In short, the plaintiff was granted leave to conduct discovery, two years after it had

closed, into the circumstances surrounding Mandl's termination, and more specifically,

whether the loan had been forgiven or whether Mandl had the contractual right to insist

on its forgiveness, when the parties executed the Separation Agreement.    At a later

conference, June 4, 2006 was fixed as the discovery cut off date.  (<u>Transcript of Hearing</u>,

held May 2, 2006, at 18)(ECF Doc. # 95.)

     The plaintiff subsequently served requests for documents and admissions.    The

discovery requests generated several disputes.  The Court resolved most of them at

discovery conferences, but a few remain, and are discussed below.  In addition, the

plaintiff served three additional expert reports, and amended her mandatory disclosures

under FED. R. CIV. P. 26(a) to list the three experts as trial witnesses.

### E.   The New Expert Reports

#### 1.   The Mark H. Edwards Report[2]

Edwards is employed by Compensia, Inc., a compensation consulting firm.  His report evaluated the competitiveness of Mandl's compensation package, and whether Mandl provided adequate consideration in exchange for the loan forgiveness.  Edwards compared Mandl's compensation to the compensation of executives working at other firms that he selected.  He concluded that Mandl's compensation for the years 1996-2001 was higher than any comparable CEO, and consequently, there was no competitive basis for the loan forgiveness.  Furthermore, the loan forgiveness, which he valued at $16.6 million, added to the release of the non-compete clause, was unreasonably high compared to the value attributable to the covenant not to sue that Mandl provided.

#### 2.   The Stephen D. Kirkland Report[3]

Kirkland is a C.P.A. employed by Moore, Kirkland & Beauston, L.L.P., a certified public accounting and consulting firm.  The Kirkland Report opined on three questions relating to the forgiveness of the $12 million loan and the waiver of the interest: (1) was it compensation for services rendered by Mandl, (Kirkland Report, at 15), (2) if so, was it reasonable,  (id., at 17), and if it was not compensation, or was not reasonable, what was the nature of the income to Mandl?  (Id., at 24.)

---

[2]    A copy of the Edwards Report is annexed as Exhibit A to the <u>Motion of Alex Mandl: (I) To Strike Untimely Expert Witness Designations, (II) To Preclude Plaintiff From Introducing Improperly Obtained Documents into Evidence, and (III) For Certain Related Relief</u>, dated June 15, 2006 ("<u>Mandl Motion</u>")(ECF Doc. # 99.)

[3]    A copy of the Kirkland Report is attached as Exhibit B to the <u>Mandl Motion</u>.

Much of Kirkland's opinion involved, and was based upon, his view of the evidence. For example, he opined in answer to the first question that the forgiveness of the loan and accrued interest "was not purely for services rendered" because "the decision to forgive the loan and interest was not made in arm's length negotiations," (id., at 16), "Teligent's Board may have agreed to forgive the loan and interest rather than pursue collection due to the fact that there was not an arm's length relationship between Mr. Mandl and the rest of the Board at the time," (id.), and "[t]he Board may not have been willing to accept the expense, delays, and publicity of legal action against Mr. Mandl." (Id.) He also opined that the forgiveness of the loan and interest, if deemed to be compensation, was excessive and unreasonable. (Id. at 19.) According to Kirkland, IDT's decision to terminate Mandl "impl[ied] that they were not pleased with Mr. Mandl's performance." (Id. at 17.) He also asserted that the forgiveness of the promissory notes was not mentioned in Teligent's SEC filings, and speculated that if Teligent's independent investors knew, "I do not believe they would have been satisfied to see a $15 million asset converted to compensation or a dividend to the CEO just days before the stock was delisted." (Id. at 18.) Finally, Kirkland opined that if the forgiveness was not compensation or reasonable in amount, it should be deemed a dividend. (Id. at 25.)

### 3.    The Paul R. Dorf Report[4]

Dorf is employed by Compensation Resources, Inc., a human resource firm that specializes in compensation consulting. His report opined that Mandl did not give adequate consideration for the forgiveness of the loan based on the following reasons:

---

[4]    A copy of the Kirkland Report is attached as Exhibit C to the Mandl Motion.

(1) Mandl did not fulfill his five-year commitment and "did not appear to comply" with the Employment Agreement,  (2) Mandl's compensation without the loan was above market, and the loan forgiveness added to his above-market compensation, (3) the amount of the loan was unreasonably high because it was not tied to any performance requirements, stock purchase requirements or any specific purpose, (4) Mandl did not provide any "recognizable" value, consideration or concessions "in exchange for the granting, and subsequent forgiveness, of the Loan," and Mandl did not provide any services to Teligent after he left its employ.  (Dorf Report, at 17.)

**F.     The Pending Motions**

On or about June 15, 2006, Mandl moved to strike the new expert witness designations (and preclude the expert reports and testimony), and to preclude the documents obtained from SpencerStuart, an executive search firm that Mandl had used to obtain his current position as President, CEO and Vice-Chairman of GemPlus International, S.A. ("GemPlus").  Mandl argued that the new expert reports were untimely.  He also maintained that the plaintiff failed to provide proper notice of the subpoena that she served on SpencerStuart.  According to Mandl, the improper service prevented him from objecting to the subpoena, which sought information that was personal, confidential, and, in large part, irrelevant.  He asked that the plaintiff be required to collect and destroy all of the SpencerStuart documents, and be precluded from relying on these documents at trial.  (See Mandl's Motion.)

The plaintiff opposed Mandl's motion, and cross-moved for preclusion and other sanctions based on several grounds.  Mandl, she said, failed to comply with his obligation to make initial mandatory disclosures.  In addition, he failed to comply with his discovery

10

obligations, including not producing documents in the possession of GemPlus and

SpencerStuart relating to his application for employment by GemPlus.  Finally, Mandl

did not turn over his income tax returns in accordance with the plaintiff's first document

request.[5]  (See Unsecured Claims Estate Representative's Objection to Alex Mandl's

Motion to Preclude Expert Reports and to Nunc Pro Tunc Quash Subpoena Duces

Tecum, Plaintiff's Request for Oral Argument and Cross Motion for Preclusion and

Other Sanctions, dated July 5, 2006 ("Plaintiff's Opposition & Cross-Motion"), at 48)

(ECF Doc. # 103.)

The plaintiff requested harsh relief.  She asked the Court to make unspecified

negative inferences.  She also sought to preclude Mandl from introducing any witnesses.

Finally, she insisted that the Court preclude Mandl "from introducing into evidence any

witness or documentary evidence (even in the nature of rebuttal or impeachment

evidence) in response to the Plaintiff's witnesses and documentary proof."  (Id., at 48-

49.)

## DISCUSSION

A.      **Mandl's Motion to Preclude**

1.      **The Expert Reports**

Mandl's motion to preclude the use of the new expert reports, and strike the

corresponding expert witness designations, is granted for three reasons.  First, the Court

never extended the deadline for submitting expert reports.  The Court extended fact

discovery only, and then only for the limited purpose of taking a few depositions to

---

[5]      Mandl also refused to produce his tax returns in response to a request made at his second
deposition.

inquire into the circumstances surrounding Mandl's departure from Teligent.  Thus, the new expert reports are more than two years late.

Second, the plaintiff never moved to extend the expert report deadline, or for permission to file additional expert reports.  In fact, she has still not done so.

Third, if I treat her opposition as a motion to file the late reports, she has failed to meet her burden.  The decision whether to allow a late expert report lies within the Court's discretion, and involves the consideration of four factors:  "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  Softel, Inc. v. Gragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997), cert. denied, 523 U.S. 1020 (1998); accord Design Strategy, Inc. v. Davis, No. 05-4909, 2006 WL 2990223, at *10 (2d Cir. Oct. 19, 2006); Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006).

### a.    Explanation

The plaintiff explains the tardy submission of the new expert reports on the basis that Mandl recently changed his theory of the case regarding the consideration he gave to Teligent.  At his 2004 deposition, Mandl testified as follows:

> Q.  Did you provide any consideration for these loans?
>
> A.  Yes.  I agreed to join Associated Communications [Teligent's former name] and leave behind what I left behind.  That was the consideration.
>
> Q.  Was there any other consideration?
>
> A.  No.

(<u>Plaintiff's Opposition & Cross-Motion</u>, at Ex. A, 31-32.)   However, in response to a
2006 interrogatory that asked Mandl to detail the consideration "for the retention of the
funds he received under the Promissory Notes . . . and the Forgiveness and/or forgiveness
obtained from Teligent pursuant to the Separation Agreement," Mandl referred the
plaintiff to the terms of the Employment Agreement and Separation Agreement.
(<u>Plaintiff's Opposition & Cross-Motion</u>, at 5.) [6]

According to the plaintiff, these answers were inconsistent, and the later
Interrogatory response "floated an entirely new theory."  (<u>Plaintiff's Opposition & Cross-Motion</u>, at 12.)  The plaintiff insists that Mandl "initially and unequivocally" stated that
the "ONLY" consideration for the loan, an "up-front bonus," was his departure from A T
& T.  In contrast, his Interrogatory answer stated that the consideration arose from the
Employment and Separation Agreements, and did not refer to A T & T.[7]  (<u>Plaintiff's
Opposition & Cross-Motion</u>, at 11-12.)

The plaintiff's argument mischaracterizes the evidence.  Mandl was asked, in
2004, to identify the consideration he provided for receiving the loan, and he responded,
in substance, that he left A T & T and joined Teligent (f/k/a Associated

---

[6]    The obligation to respond to the Interrogatory depended on whether Mandl denied paragraph 38 of
the Request for Admissions.  The Interrogatory was meant to cross-reference paragraph 37, which asked
Mandl to admit that he had provided no consideration for the loan or the Forgiveness, as quoted in the text
above.  Mandl apparently understood the Interrogatory to refer to this request.

[7]    At another point (<u>Plaintiff's Opposition & Cross-Motion</u>, at 22-23), the plaintiff wrote:

   Prior to the Initial Expert Discovery Close Date, the Defendant's only basis and
   allegation of consideration/value for the provision and forgiveness of the Loan was his
   departure from AT&T.  Because the Defendant unequivocally stated that his departure
   from AT&T was the ONLY consideration for the Loan . . . the Plaintiff did not believe
   that an expert report was required to rebut the Defendant's factual theory and defense. . . .

Communications).  He never testified that the "ONLY" consideration was leaving A T & T.[8]  Moreover, the allegedly inconsistent Interrogatory response answered a different question.  The deposition question asked about the consideration for receiving the loan, while the Interrogatory asked Mandl to identify the consideration for receiving the loan, and for its forgiveness under the Separation Agreement.

On a more fundamental level, the explanation is nonsensical.  Teligent paid Mandl to join Teligent.  It is true that this meant leaving the number two position at A T & T, and it is fair to assume that Mandl's compensation was intended, in part, to induce that departure.  Nevertheless, Teligent was paying Mandl to assume the duties of Chairman and Chief Executive Officer of Teligent; it would not have paid him simply to leave A T & T if he did not join Teligent.  In fact, his mere departure from A T & T did not provide any legal consideration to Teligent.  If the plaintiff really believed what she now says she did, she should have moved for partial summary judgment on the issue that Teligent failed to receive "reasonably equivalent value."  Accordingly, the first Softel factor tips decidedly in Mandl's favor.

### b.      Importance

The expert reports do not address any material issue, and are not important to the plaintiff's case.  The substance of the three reports is that the compensation promised to Mandl in 1996 was excessive and unreasonable, and the loan forgiveness in 2001 made it even more so. In other words, Teligent made a bad deal because it agreed to overpay

---

[8]      Mandl's testimony was consistent with other testimony at the 2004 deposition, which the plaintiff ignores.  Mandl stated that the loan was designed as a bonus to induce him to leave A T & T, and as a retention mechanism to force him remain with Teligent and perform his duties.  See Mandl I, 325 B.R. at 84.

Mandl.  The experts purported to demonstrate this by comparing Mandl's compensation at Teligent with his A T & T compensation and the compensation received by other similarly-situated executives, and also by analyzing the factors that generally determine the nature and amount of compensation, including loans.  In addition, the Kirkland Report opined that based on the tax law, the Forgiveness should be considered a dividend.

This litigation does not involve an excessive compensation claim, which sounds in waste, Marcus v. Lincolnshire Mgmt., Inc., 409 F. Supp. 2d 474, 480 & n. 28 (S.D.N.Y. 2006)(applying Delaware law); see Marx v. Akers, 666 N.E.2d 1034, 1042-43 (N.Y. 1996), and belongs to the corporation, i.e., Reorganized Teligent.[9]  See Marcus, 409 F. Supp. 2d at 480 (excessive compensation is a derivative claim that alleges harm to the corporation).  More importantly, the plaintiff is not seeking to avoid any transfers (i.e., compensation) made to Mandl under the Employment Agreement in 1996, or set aside the obligation, undertaken at that time, to forgive the loan if Teligent terminated Mandl other than for cause.[10]  Instead, she is only seeking to set aside the 2001 Forgiveness.  But if the Forgiveness simply satisfied Teligent's enforceable obligation to forgive the loan (or the loan had already been forgiven for some of the reasons suggested in Mandl I, 325 B.R. at 87-88), it is not clear how the Forgiveness could be a fraudulent

---

[9]    The plaintiff conceded at a recent conference that she was not asserting an excessive compensation claim, (Transcript of hearing held May 25, 2006, at 14)(ECF Doc. # 102), and moreover, lacks the standing to raise such a claim.  See Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.), 307 B.R. 744, 749 (Bankr. S.D.N.Y. 2004)(Teligent's claim for breach of fiduciary duty revested in Reorganized Teligent, and the plaintiff lacked standing to assert it).

[10]    The 1998 amendment to the Employment Agreement accelerated the forgiveness of 20% of the loan and the accrued interest, leaving a $12 million balance.  See Mandl I, 325 B.R. at 83.  The modification does not change my analysis, and for sake of brevity, all references are to the 1996 Employment Agreement.

transfer.

In short, the new expert reports purport to support an excessive compensation claim that is not before me.  They fail to shed light – to the extent any expert report could – on the collectibility, or "value," of the loan receivable at the time of the Separation Agreement, or on whether the loan was forgiven in satisfaction of a pre-existing contractual obligation to do so.  Finally, Kirkland's "dividend" theory, which is derivative of the excessive compensation claim, is new to the case.  The plaintiff never argued that the Forgiveness should be deemed a dividend, or that the payment of a dividend by an insolvent corporation is a fraudulent transfer.  See ESB Litig. LLC v. Barclays Global Investors, N.A., 304 F.3d 302, 305 (3d Cir. 2002).  Accordingly, this Softel factor weighs against allowing the new expert reports.

### c.    Prejudice to Mandl

Allowing the designation of three new experts at this late date will cause Mandl to suffer prejudice.  The new expert reports advance a theory based, in large part, upon a comparison of Mandl's compensation to what other executives received, and on the criteria that govern executive compensation.  If interjected into this case, Mandl will be forced to incur additional expenses to depose the plaintiff's three experts, hire his own experts to meet the plaintiff's new excessive compensation theory, and possibly, move to exclude some or all of the plaintiff's experts' testimony under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See Millennium Expressions, Inc. v. Chauss Mktg., Ltd., No. 02 Civ 7545, 2006 WL 288353, at *2 (S.D.N.Y. Feb 6, 2006).  This represents "severe" prejudice.  See Design Strategy, 2006 WL 2990223, at *11.  The new expert reports "have redrawn the boundaries of the case," and because Mandl would be

16

forced, at this late date "to accommodate potentially significant shifts in the theories being offered against [him], this factor cuts in favor of" Mandl. <u>Softel</u>, 118 F.3d at 962.

### d.    Continuance

While a continuance is always possible, it would be inappropriate in this case. Deadlines should be observed, and when the other factors militate strongly in favor of precluding the expert testimony, it should be precluded. <u>Millennium Expressions</u>, 2006 WL 288353, at *2. In addition, this adversary proceeding has already been the subject of numerous continuances, some unintended. The original discovery (and expert report) deadline expired in March 2004. In 2005, the parties made cross-motions for summary judgment, and the plaintiff subsequently filed a notice of appeal and leave to appeal from the interlocutory orders that followed from the decisions in <u>Mandl I</u> and <u>Mandl II</u>. This effectively brought the adversary proceeding to a halt for several months, until February 2006. When discovery was reopened for the limited purpose of inquiring into the "New Defenses," the plaintiff abused the privilege by attempting to introduce new expert reports, without prior permission, more than two years after the deadline had passed. This, as well as fresh discovery disputes, have plunged the parties and the Court into additional litigation, and more cost and delay.

As already indicated during the discussion of "prejudice," if the Court allows the plaintiff to use the new expert reports, it will have to grant a continuance for Mandl to hire his own experts and reopen expert discovery. Furthermore, the new wave of expert reports on both sides will undoubtedly generate motions <u>in limine</u> to preclude on other grounds, and possibly, the need to hold <u>Daubert</u> hearings. Given the disregard of the original expert report (and discovery) deadline, "the enormous length of every step of the

proceedings in this case [militate] against more continuances." <u>Softel</u>, 118 F.3d at 962.

Accordingly, the final <u>Softel</u> factor militates against permitting the introduction of the

new expert reports and testimony.  Since all four <u>Softel</u> factors weigh against the use of

the new expert reports, the reports, and the experts' testimony, will be precluded.

### 2.    The SpencerStuart Documents

Mandl's motion to preclude the use of the SpencerStuart documents is denied

without prejudice.  SpencerStuart is the executive search firm that Mandl used to help

land his current job with GemPlus.  The plaintiff believed that Mandl filled out an

application or other document for SpencerStuart in which he stated that he had resigned

from Teligent.  She wanted to see that document.

On or about May 5, 2006, the plaintiff issued a <u>subpoena duces tecum</u> to

SpencerStuart, (<u>see</u> <u>Mandl Motion</u>, Ex. F), that demanded the production of documents

on June 2, 2006.  According to the plaintiff, she served SpencerStuart with a <u>subpoena</u>

<u>duces tecum</u> on or about May 5, 2006, and at the same time, mailed a copy to Mandl's

lawyers, at "Kirkpatrick & Lockhart Nicholson Graham LLP, Judith Sturtz Karp, Esq.,

599 Lexington Avenue, New York, New York 10022."  (<u>See</u> <u>Plaintiff's Opposition &</u>

<u>Cross-Motion</u>, Ex J., ¶ 2; <u>Consolidated (I) Reply In Support of Motion of Alex Mandl to</u>

<u>Strike Untimely Expert Witness Designations and Preclude Improperly Obtained</u>

<u>Evidence, and (II) Objection to Plaintiff's Cross-Motion for Preclusion and Other</u>

<u>Sanctions</u>, dated July 20, 2006 ("<u>Mandl's Reply</u>"), at Ex. D)(ECF Doc. # 105.))

The mailing was misaddressed.  Ms. Karp works in Kirkpatrick & Lockhart's

D.C. office, a fact that the plaintiff knew.  Kirkpatrick & Lockhart further contends that it

was never served, or at least, that it never received a copy of the <u>subpoena duces tecum</u> in time to object to the disclosure of personal and confidential information regarding Mandl's employment history.  Mandl subsequently received copies of the documents turned over by SpencerStuart.

The plaintiff has never satisfactorily explained why she sent the <u>subpoena duces tecum</u> to Ms. Karp in New York rather than Washington, D.C.  However, accepting her statement that she did, it is equally perplexing why the Firm's mailroom apparently failed to forward it to Ms. Karp or anyone else.  The resolution of these issues would ordinarily require an evidentiary hearing, but this may be unnecessary.  Mandl has not identified any StuartSpencer document whose contents should not be disclosed; until he does, the absence of timely notice is harmless.  Accordingly, Mandl's motion to preclude the use of the SpencerStuart documents is denied without prejudice.  If there are particular documents that should be precluded, held in confidence or returned to SpencerStuart, Mandl may raise the issue as to those specific documents.

**B.    The Plaintiff's Cross-Motion**

The Plaintiff seeks sanctions against Mandl based upon his failure to produce documents in his GemPlus personnel file and his federal tax returns, and his failure to provide adequate information in his initial mandatory disclosures under FED. R. CIV. P. 26(a).  The plaintiff asks the Court to make unspecified negative inferences, to preclude Mandl from introducing any witnesses, and to preclude Mandl "from introducing into evidence any witness or documentary evidence (even in the nature of rebuttal or impeachment evidence) in response to the Plaintiff's witnesses and documentary proof." (<u>Plaintiff's Opposition & Cross-Motion</u>, at 48-49.)

### 1.      The Rule 34 Document Response

Rule 37(d) governs the award of sanctions based upon the total failure to respond

to discovery.  The subparagraph states, in pertinent part:

> If a party . . . fails . . . (3) to serve a written response to a request for
> inspection submitted under Rule 34, after proper service of the request, the
> court in which the action is pending on motion may make such orders in
> regard to the failure as are just, and among others it may take any action
> authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of
> this rule.  In lieu of any order or in addition thereto, the court shall require
> the party failing to act or the attorney advising that party or both to pay the
> reasonable expenses, including attorney's fees, caused by the failure unless
> the court finds that the failure was substantially justified or that other
> circumstances make an award of expenses unjust.

On or about May 25, 2003, the plaintiff sent a broad, two-paragraph document request

that asked Mandl to produce (1) all documents relating to the "Transfers" and (2) all

documents relating to any defenses to the "Transfers."  The document request defined

"Transfers" to include "all transfers . . . alleged in the complaint . . . and as contemplated

within" various specified provisions of the Bankruptcy Code.  (Mandl's Reply, Ex. F, at

4.)

Mandl did not object to or serve a written response to the Rule 34 discovery

request.  Although the failure is not condoned, Mandl nevertheless produced documents

together with his mandatory disclosures. [11]  Moreover, no reasonable person would have

concluded that the request called for the production of Mandl's GemPlus personnel file or

his personal income tax returns in light of the nature of the plaintiff's fraudulent transfer

claims.

In any event, I decline to entertain a request for sanctions based upon this initial

---

[11]      Mandl's initial disclosure referred to Bates-stamp numbered documents that seem to correspond to
the categories of documents that Mandl identified.

discovery failure.  A party must bring discovery abuses to the Court's attention within a reasonable time.  Brandt v. Vulcan, Inc., 30 F.3d 752, 756 (7th Cir. 1994); Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 886 (S.D.N.Y. 1999); Gault v. Nabisco Biscuit Co., 184 F.R.D. 620, 622 (D. Nev. 1999); Glenn v. Scott Paper Co., No. 92 Civ. 1873, 1993 WL 431161 *17 n.3 (D.N.J. Oct. 20, 1993).  The determination of timeliness turns on when the movant learned of the discovery issue, and how long he waited before bringing it to the court's attention.  Brandt, 30 F.3d at 756 (motion for sanctions made at trial deemed untimely when the movant "clearly possessed information indicating that defendant's discovery responses were incomplete long before trial").  Bringing a motion for sanctions promptly allows a judge to "rule on the matter when it is still fresh in his mind."  Mercy v. County of Suffolk, NY, 748 F.2d 52, 55 (2d Cir. 1984).

Here, the plaintiff delayed unreasonably in raising Mandl's non-compliance with the original discovery demands.  The plaintiff served her document request in May 2003.  Mandl's response was due within 30 days, or by late June 2003.  FED. R. CIV. P. 34(b).  The plaintiff obviously knew by then that Mandl had not complied.  Yet she failed to raise it with the Court until three years later, and more than two years after the close of the original discovery.  According to the electronic docket sheet and underlying documents filed in this adversary proceeding, the plaintiff first raised Mandl's failure to file a Rule 34 response in a letter to the Court dated June 16, 2006.  (ECF Doc. # 101.)  Had the plaintiff asked in a timely manner for a discovery conference on this issue, the Court would have directed Mandl to file a response to the two paragraph request, and this issue might have been resolved on that basis.  See Bankr. S.D.N.Y.R. 7007-1(b)("No discovery-related motion under Bankruptcy Rules 7026 through 7037 shall be heard

unless counsel for the moving party first requests an informal conference with the Court

and either the request has been denied or the discovery dispute has not been resolved as a

consequence of the conference.")

Furthermore, the plaintiff seeks possibly "case-ending" sanctions based on this

and other original discovery failures.  Precluding Mandl from offering any evidence of

any kind would certainly have streamlined the litigation, and arguably led to a motion for

summary judgment by the plaintiff.  Yet after the original discovery failures occurred, the

plaintiff continued to litigate other procedural issues as well as issues going to the merits,

without raising Mandl's non-compliance.  She participated in discovery conferences,

amended her complaint and unsuccessfully sought leave to amend it again, made

discovery-related motions against Kirkpatrick & Lockhart, moved for partial summary

judgment and reconsideration, appealed to the district court from Mandl I and Mandl II,

and even sought sanctions against Mandl for violating the Court's general mediation

order.  A great deal of water has passed under this bridge, and having unreasonably

delayed, the plaintiff cannot now complain about discovery failures, real or perceived,

that occurred in early 2003.

### 2.    The GemPlus Documents

After the Court reopened discovery, the plaintiff attempted to obtain copies of any

applications that Mandl prepared when he interviewed for his current position at

GemPlus.  On May 5, 2006, she sent an e-mail to Ms. Karp that demanded "any and all

applications and/or other documentation completed by Mr. Mandl when he interviewed

for a position with GemPlus, including any documentation and/or applications completed

for SpencerStuart, the search firm that assisted in this placement."  (Plaintiff's

Opposition & Cross-Motion, Ex. D, at 1.)  The plaintiff specifically cited FED. R. CIV. P.

34 as the basis for the demand.  A subsequent e-mail sent by the plaintiff on June 9, 2006,

referred to Mandl's response, (see Plaintiff's Opposition & Cross-Motion, Ex. E), but that

response was not included in the submissions.

        One of the sticking points concerned Mandl's obligation to search through and

produce documents from GemPlus' files.  Mandl contends, in opposition to the motion

for sanctions, that he did not have to produce documents in GemPlus' possession.

(Mandl's Reply, at ¶¶ 35-36.)  I disagree.  Rule 34 requires a party to produce documents

in his "custody, possession or control."  If a party has the legal right or practical ability to

obtain documents from a non-party, he has "control" of those documents within the

meaning of Rule 34.  E.g., In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. 177,

180 (S.D.N.Y. 2006) (directors and officers must produce documents in the possession of

their non-party employer); In re Nasdaq Market-Makers Antitrust Litig., 169 F.RD. 493,

531 (S.D.N.Y. 1996) (employer must produce documents in the possession of non-party

employees); Cooper Indus. Inc., v. British Aerospace, 102 F.R.D. 918 (S.D.N.Y. 1984)

(party must produce documents held by a wholly owned non-party affiliate); M.L.C. Inc.

v. N. American Philips Corp., 109 F.R.D. 134, 136-137 (S.D.N.Y. 1986) (subsidiary must

produce documents held by its foreign non-party parent); see also 7 JAMES WM. MOORE,

MOORE'S FEDERAL PRACTICE § 34.14[2][a]-[c], at 34-61-34-73 (3d ed. 2005)("MOORE").

        Mandl is a high-ranking officer and director of GemPlus.  He has never suggested

that he lacked the legal right, or at least the practical ability, to produce documents in his

personnel file.[12]  Thus, he was obliged to do so.  See In re Flag Telecom Holdings, Ltd.
Sec. Litig., 236 F.R.D. at 180.  His non-compliance, however, does not entitle the
plaintiff to the drastic remedies provided under FED. R. CIV. P. 37(b).  Rule 37(d), which
incorporates these remedies, does not apply because Mandl apparently answered the e-
mail demand with an e-mail response.  In addition, Rule 37(b) does not apply because the
Court did not enter an order under FED. R. CIV. P. 37(a) compelling Mandl to produce the
GemPlus documents.

       Rather, Mandl's failure to produce the GemPlus documents is an incomplete or
evasive response within the meaning of Rule 37(a)(3).  Where the responding party
provides an incomplete or evasive answer, the adequacy of the response may be tested by
a motion to compel discovery.  7 MOORE §§ 37.02[5] & 37.03, at 37-21.  As discussed in
greater detail below, the sanctions available to a party that has prevailed on a motion to
compel are limited to the expenses, including the attorneys' fees, incurred in making the
motion.  Id., § 37.03, at 37-21.  Although the plaintiff did not make a motion to compel
discovery, I will treat this aspect of her motion as one to compel the production of
responsive GemPlus documents, and grant it.  See FED. R. CIV. P. 37(a)(2).   Mandl is,
therefore, directed to search the files at GemPlus, and produce any documents relating to
the reasons surrounding his departure from Teligent.

       **3.      Mandl's Income Tax Returns**

       The plaintiff also seeks sanctions based upon Mandl's failure to produce his
personal income tax returns for the years 1996 through 2005, as allegedly demanded in

---

[12]        In contrast, Mandl had no obligation to produce documents in the possession of SpencerStuart.  He
was not affiliated with SpencerStuart.

the 2003 production request, and at Mandl's deposition.  The plaintiff raised this issue at a May 2, 2006, discovery request, and I refused to direct Mandl to produce his income tax returns.  (Transcript of hearing held May 2, 2006, at 15-16)(ECF Doc. # 95.)  The plaintiff was then granted leave to file this motion to compel their production.  (Id., at 18.)

The motion to compel Mandl to produce his personal income tax returns is denied.[13]  First, to the extent that the plaintiff relies on the alleged disregard of the 2003 document request, the motion is untimely.  Furthermore, the original document request was limited to the period spanning May 1, 2000 to September 6, 2002, and not the ten years now demanded.  Second, the demand at Mandl's 2006 deposition exceeded the scope of new discovery permitted by the Court.  Third, Mandl's income tax returns are irrelevant to the plaintiff's fraudulent transfer claims.  It does not matter how Mandl treated the various forms of consideration that he received for federal (or state) income tax purposes.  What matters is the value of the interest in property that Teligent transferred, and whether it received "reasonably equivalent value" in exchange for that transfer.

### 4.    The Initial Disclosures

Lastly, the plaintiff seeks the same drastic sanctions, including the preclusion of any testimonial or documentary evidence at trial, based on Mandl's failure to comply with the initial disclosure requirements under FED. R. CIV. P. 26(a)(1).[14]  The Court

---

[13]      As with the GemPlus documents, there is no outstanding order compelling Mandl to produce his income tax returns.

[14]      Rule 26(a)(1) provides, in pertinent part, that each party must disclose the following without awaiting a discovery request:

directed that all initial disclosures be served by December 1, 2003.  Mandl sent his to the

plaintiff on or about January 20, 2004.  (Plaintiff's Opposition & Cross-Motion, Ex. L.)

The plaintiff identified three shortcomings that, she contends, have caused prejudice: (1)

Mandl served his disclosures nearly two months after the deadline, (2) he did not identify

any one with discoverable information, and (3) he failed to identify the location of

relevant documents.  (See Unsecured Claims Estate Representative's Reply and Surreply

to Defendant's Consolidated Reply and Objection Relating to Defendant's Motion to

Quash and for Other Relief, and the Plaintiff's Cross-Motion to Preclude and to Make a

Negative or Adverse Inference, and Plaintiff's Request for Leave to File Sur-Reply, dated

Aug. 1, 2006, at 25) (ECF Doc. # 106.)

　　　　For the reasons noted earlier, this objection is untimely.  The mandatory

disclosure was due by December 1, 2003, and Mandl served his disclosures on January

20, 2004.  The plaintiff only raised these objections recently, and has not explained why.

She also failed to show how she was prejudiced by the seven week delay.  Furthermore,

although Mandl did not identify himself as a person with discoverable information, the

omission did not fool the plaintiff.  He is the sole defendant, and she took his deposition

twice.

　　　　Lastly, Mandl's initial disclosures identified three categories of relevant

---

 (A) the name and, if known, the address and telephone number of each individual likely
to have discoverable information that the disclosing party may use to support its claims or
defenses, unless solely for impeachment, identifying the subjects of the information;

(B) a copy of, or a description by category and location of, all documents, data
compilations, and tangible things that are in the possession, custody, or control of the
party and that the disclosing party may use to support its claims or defenses, unless solely
for impeachment. . . .

documents:  (1) his separation agreement with A T & T, and the documents relating to

the compensation that he forfeited upon his departure, (2) the Employment Agreement,

and related correspondence and documentation, and (3) the Separation Agreement.

Mandl maintained that the documents were already in the plaintiff's possession.  In

addition, he stated that he was also in possession of these categories of documents, and

apparently turned them over with his initial disclosures.

### 5.    Sanctions

Although the plaintiff is not entitled to the more drastic sanctions identified in

FED. R. CIV. P. 37(b), the question of sanctions under Rule 37(a) remains open.  Rule

37(a)(4) states:

> (A) If the motion is granted or if the disclosure or requested discovery is
> provided after the motion was filed, the court shall, after affording an
> opportunity to be heard, require the party or deponent whose conduct
> necessitated the motion or the party or attorney advising such conduct or
> both of them to pay to the moving party the reasonable expenses incurred
> in making the motion, including attorney's fees, unless the court finds that
> the motion was filed without the movant's first making a good faith effort
> to obtain the disclosure or discovery without court action, or that the
> opposing party's nondisclosure, response, or objection was substantially
> justified, or that other circumstances make an award of expenses unjust.

> (B) If the motion is denied, the court may enter any protective order
> authorized under Rule 26(c) and shall, after affording an opportunity to be
> heard, require the moving party or the attorney filing the motion or both of
> them to pay to the party or deponent who opposed the motion the
> reasonable expenses incurred in opposing the motion, including attorney's
> fees, unless the court finds that the making of the motion was substantially
> justified or that other circumstances make an award of expenses unjust.

> (C) If the motion is granted in part and denied in part, the court may enter
> any protective order authorized under Rule 26(c) and may, after affording
> an opportunity to be heard, apportion the reasonable expenses incurred in
> relation to the motion among the parties and persons in a just manner.

The trial court has broad discretion in imposing sanctions under Rule 37(a)(4).

See Corp. of Lloyd's v. Lloyd's U.S., 831 F.2d 33, 36 (2d Cir. 1987); Smith v. Conway

Org., 154 F.R.D. 73, 78 (S.D.N.Y. 1994).  Nevertheless, the Rule imposes a rebuttable

presumption.  Generally, the court must award the successful party reasonable expenses,

including attorney's fees, unless the losing party's position was substantially justified or

other circumstances make the award of sanctions unjust (or the successful movant failed

to make a good faith effort to resolve the dispute without the court's intervention).  If the

court grants the motion in part and denies the motion in part, the court may also apportion

the expenses.  Alternatively, the Court may deny expenses to both parties.  See Smith v.

Conway, 154 F.R.D. at 78; see generally 7 MOORE § 37.23[4][b], at 37-48 to 37-49.

Here, the Court compelled the production of the GemPlus documents, but refused

to compel production of the income tax returns.  I conclude that on balance, each party

should bear its own expenses.  Standing alone, the motion to compel the production of

the GemPlus documents might warrant an award.  However, the motion relating to the

income tax returns was not substantially justified.  The plaintiff never properly requested

the income tax returns.  The broad initial request could not be read to cover the returns,

and the plaintiff never raised the failure until more than two years after the close of

discovery.  Moreover, the period covered by the initial document request was far shorter

than the extended period covered by the tax documents that the plaintiff sought through

her motion.  After discovery was reopened for a limited purpose, the plaintiff never

requested the tax returns in accordance with Rule 34, and such a request would have

exceeded the limited purpose for reopening discovery.  Finally, Mandl's tax treatment of

the original loan or the Forgiveness is irrelevant for the reasons already stated.

The parties are directed to settle an order consistent with the rulings in this

decision.  They are further directed to exchange pre-marked exhibits and witness lists

within 20 days.  This matter is deemed ready for trial, and the parties will receive 72

hours notice of the trial date.


Dated: New York, New York
　　　November 13, 2006


　　　　　　　　　　　　　　/s/  *Stuart M. Bernstein*
　　　　　　　　　　　　　　　STUART M. BERNSTEIN
　　　　　　　　　　　　　　Chief United States Bankruptcy Judge