UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
In re:                                          :

                                            :      Chapter 11

          TELIGENT INC.,                 :      Case No. 01-12974 (SMB)

                                            :

                    Debtors.       :
------------------------------------------------------X
SAVAGE & ASSOCIATES, P.C., as the      :
Unsecured Claim Estate Representative      :
of TELIGENT, INC.,                      :      Adv. Pro. No. 03-02523

                                              :

                    Plaintiff,       :

                                                :

               against              :

                                                :

ALEX MANDL,                           :

                                                :

                    Defendant.       :
------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

SAVAGE & ASSOCIATES, P.C.
Attorneys for Plaintiff
P.O. Box. 804
Croton on Hudson, New York 10520-0804

       Denise L. Savage, Esq.
          Of Counsel


KIRKPATRICK & LOCKHART
   PRESTON GATES ELLIS LLP
Attorneys for Defendant
599 Lexington Avenue
New York, NY 10022

       Robert N. Michaelson, Esq.
       Eric T. Moser, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The plaintiff commenced this adversary proceeding to avoid and recover preferential and fraudulent transfers made by the debtor, Teligent, Inc. ("Teligent"), to its former Chairman and Chief Executive Officer ("CEO"), Alex Mandl.  The dispute between the parties has been the subject of several opinions.  See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 325 B.R. 81 (Bankr. S.D.N.Y. 2005) ("Mandl I"); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 325 B.R. 134 (Bankr. S.D.N.Y. 2005) ("Mandl II"); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 346 B.R. 73 (Bankr. S.D.N.Y. 2006) ("Mandl III"); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 358 B.R. 45 (Bankr. S.D.N.Y. 2006) ("Mandl IV"); Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.), 358 B.R. 63 (Bankr. S.D.N.Y. 2006) ("Mandl V").

The Court conducted a bench trial on April 23, 2007.  For the reasons that follow, the Court concludes that the plaintiff is entitled to avoid the transfers that are the subject of the amended complaint, and recover a judgment in the aggregate sum of $12,040,105.40, plus interest on $40,105.40 at the federal judgment rate from the petition date to the date of the entry of judgment, in addition to the costs and disbursements of this adversary proceeding.

# FACTS[1]

### A.    The Terms of Mandl's Employment

Prior to joining Teligent, Mandl was the president and chief operating officer of AT&T.  (Tr. at 170.)  On or about August 19, 1996, he entered into an employment agreement with Teligent's predecessor, Associated Communications, LLC, effective September 1, 1996, to serve as its Chairman of the Board and CEO (the "Employment Agreement").  (DX A.)  The Employment Agreement granted Mandl "such authorities, duties and responsibilities customarily assigned" to those positions in like companies, and prohibited Teligent from assigning Mandl any duties or responsibilities that were "materially inconsistent with, or that materially impair his ability to discharge, the foregoing duties and responsibilities."  (DX A at ¶ 3.)  The initial term of the Employment Agreement ran for six years, and was extended automatically thereafter for one year periods unless either party elected not to extend.  (Id. at ¶ 2.)

As part of the same transaction, Microwave Services, Inc. and Digital Services Corp., the original shareholders of Teligent, loaned Mandl the aggregate sum of $15 million.  Mandl signed two promissory notes (the "Notes") evidencing the $15 million loan.  (See DX A at Exs. B-1, B-2.)  The Notes bore interest at a rate equal to the "AFR as of September 1, 1996," but no evidence was offered regarding the actual interest rate. By letter agreement, dated November 4, 1998 ("Letter Amendment"), the original shareholders assigned the Notes to Teligent.  (See DX B.)

---

[1]    In this opinion, "Tr." refers to the trial transcript (ECF Doc. # 143), "PX" refers to the plaintiff's trial exhibits, and "DX" refers to Mandl's trial exhibits.  The parties have also designated portions of deposition testimony, and have objected to parts of the other party's designated testimony.  To the extent that deposition testimony is cited in this opinion, any objections that were raised during the depositions or in the post-trial submissions, and not addressed in this opinion, are overruled.

The Employment Agreement included several provisions under which the loan would be automatically forgiven.  In particular, paragraph 4(f) stated that the loan would "automatically be forgiven" if, prior to the fifth anniversary of the Employment Agreement, Teligent terminated Mandl's employment "other than for Cause," or Mandl terminated his employment for "Good Reason."  (Id.)  Good Reason included Teligent's failure to comply with any material provision of the Employment Agreement, including a breach of the provision committing Teligent to employ Mandl as its Chairman and CEO with the customary duties and responsibilities.  (Id. at ¶¶ 6(d)(i), 3.)  In either case, the terminating party had to give a written Notice of Termination to the other party.  (Id. at ¶ 6(e).)  If Mandl was terminated for Good Reason, his Notice of Termination had to detail the facts and circumstances claimed as the basis for the termination.  (See id.)  In addition, Mandl had to give Teligent twenty days to cure the breach.  (Id. at ¶ 6(d)(i).)  Finally, upon termination of his employment, Mandl was required to resign from the Board.  (Id. at ¶ 3.)

The Letter Amendment partially accelerated the automatic forgiveness provision. It modified the Employment Agreement to state that one-fifth of the principal and all of the outstanding interest would be forgiven on the first anniversary of the Effective Date (i.e., September 1, 1996), provided that Mandl remained employed by Teligent.  The first anniversary had already passed by then, and consequently, the balance of the loan was reduced to $12 million.

## B.    The Arrival of IDT

On April 17, 2001, IDT Corp. ("IDT") acquired Microwave Services, Inc., one of Teligent's original shareholders and a wholly owned subsidiary of Liberty Media Corp.

4

(TELIGENT, INC., ANNUAL REPORT (FORM 10-K/A), at 9 (June 4, 2001) ("2000 FORM 10-K/A").)[2]   As a result of the acquisition, IDT acquired beneficial ownership of 41.1% of Teligent's Class A Common Stock.  (Id. at 10.)

Liberty Media had the right to elect three directors to Teligent's Board of Directors.  (Id. at 9.)  On April 17, 2001, two Teligent directors resigned (leaving three vacancies), and on that same day, Liberty Media nominated Howard Jonas, Morris Lichtenstein and Anthony Davidson to the Board.  (See TELIGENT, INC., CURRENT REPORT (FORM 8-K), at 2 (Apr. 25, 2001).)  Jonas was the Chairman, CEO and Treasurer of IDT.  (TELIGENT, INC., CURRENT REPORT (FORM 8-K), at 2 (May 2, 2001).) Lichtenstein and Davidson were also employees of IDT.  (See 2000 FORM 10-K/A at 2-3.)  The three were elected to the Board on April 19, 2001, (TELIGENT, INC., CURRENT REPORT (FORM 8-K), at 2 (Apr. 25, 2001)), and Jonas served as Chairman of Teligent's

---

[2]       The 2000 FORM 10 K/A, as well as certain other SEC filings, were not premarked or offered at trial but were nevertheless cited by the plaintiff in her post-trial submissions.  (See Plaintiff's Proposed Findings of Fact, dated July 13, 2007, at ¶¶ 27, 63, 69, 94A)(ECF Doc. # 147.)  Mandl also cited to certain SEC filings, which, though premarked, were not received in evidence.  (See Post-Trial Brief of Defendant, Alex Mandl, dated Aug. 13, 2007, at 3 n.7)(ECF Doc. # 149.)  Both parties agree that the Court can take judicial notice of SEC filings, as well as the Court's own files, see Fed. R. Evid. 201, but disagree on what this means.  The plaintiff implies that this renders the contents admissible; Mandl argues that the contents are hearsay, and are not admissible in the absence of an exception to the hearsay rule.  (See Post-Trial Brief of Defendant, Alex Mandl, dated Aug. 13, 2007, at 14)

        Mandl is correct.  The taking of judicial notice simplifies the process of authenticating a document, but does not automatically render the document admissible in the face of a hearsay objection. BARRY RUSSELL, BANKRUPTCY EVIDENCE MANUAL § 201.5, at 706-07 (2007); see Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir. 1996)(taking judicial notice of an SEC filing "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents")(citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)); In re Scarpinito, 196 B.R. 257, 267 (Bankr. E.D.N.Y. 1996)("While a bankruptcy judge may take judicial notice of a bankruptcy court's records, . . . we may not infer the truth of facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court.")(citations omitted).

        The Teligent SEC filings represent admissions by Teligent.  The plaintiff is the successor to Teligent, see In re Teligent, Inc., 326 B.R 219, 226 (S.D.N.Y. 2005), and the contents are non-hearsay as to her.  The contents are not, however, admissible against Mandl.  The contents of IDT's SEC filings are not admissible because they are hearsay, and the plaintiff has failed to show that they are admissible under an exception to the hearsay rule.

Board until he resigned as the Chairman and as a director on May 25, 2001.  (See

Teligent, Inc. Current Report (Form 8-K), at 2 (May 25, 2001).)  As of May 28,

2001, the Board consisted of six directors.  (See 2000 Form 10-K/A at 2.)  Three of the

six – Davidson, Lichtenstein and Yoav Krill (apparently Jonas' replacement) – were from

IDT.  (See id. at 2-3.)

**C.     The Termination of Mandl's Employment**

The arrival of IDT triggered Mandl's departure from Teligent.  The Court heard

two different versions of what occurred.  At trial, Mandl testified that Jonas came to his

office, he thought on April 18, 2001.  (Tr. at 158.)  Jonas told Mandl it was time for him

(Mandl) to leave because Jonas wanted to bring in his own CEO and management team.

(Tr. at 158-59, 161.)  Mandl did not recall whether Jonas told him he was fired or asked

him to resign.  (Tr. at 159.)  Mandl understood what Jonas was saying; following the

meeting, he packed up, left and never returned to Teligent.  (Tr. at 159.)  He did not

believe that he was still employed by Teligent, or that that there was any possibility that

he might be rehired.  (Tr. at 159.)

Mandl recounted a different version in the spring or summer of 2001 during an

interview with a Washington reporter, Jeremy M. Brosowsky.  An edited version of the

interview appeared in the July 2001 issue of the Washington Business Forward (the

"Interview") (PX 18), and was attached to Brosowsky's deposition transcript as Exhibit

A.  (See PX 19.)  Brosowsky asked Mandl about the circumstances surrounding his

departure from Teligent.  According to the Interview, Mandl was disappointed over his

inability to convince the Board to adopt his $700 million recapitalization plan.  (PX 18 at

2-3.)  Perhaps because of this, but in any case, he thought the time had come to move on.

(<u>Id.</u> at 4.)  He discussed the prospect of his departure with some key members of the

Teligent Board, but did not want to leave Teligent in the lurch, and decided to wait for

the right moment.  (<u>Id.</u>)  The right moment arrived when IDT took over control of

Teligent.  (<u>Id.</u>)  Mandl told IDT that he thought it was the right time to move on, and that

was his preference.  (<u>Id.</u>)  His plan also worked for IDT, who wanted direct control of

Teligent.  (<u>Id.</u>)

Mandl's actual termination was effected through a "Separation Agreement and

Release," dated April 27, 2001 (the "Separation Agreement").  (DX C.)  It stated that

Mandl's employment as CEO was terminated by Teligent, "other than for cause,"

effective April 27, 2001, (<u>id.</u> at ¶ 1), and the parties waived the Notice of Termination

provisions in the Employment Agreement.  (<u>Id.</u> at ¶ 2(b).)  In addition, Mandl resigned as

Chairman of the Board, from every committee of which he might be a member, and as an

officer of any affiliates or subsidiaries.  (<u>Id.</u> at ¶ 1.)

The parties also exchanged releases.  (<u>Id.</u> at ¶ 3.)  They restructured the automatic

forgiveness of the $12 million to forgive it in twenty annual installments rather than all at

once.  (<u>Id.</u> at ¶ 7.)  Mandl signed the Separation Agreement on May 8, 2001.  Stuart

Kupinsky, Teligent's General Counsel, signed on behalf of Teligent on May 17, 2001.

## D.    The Bankruptcy and This Litigation

Teligent and numerous affiliates (collectively "Teligent") filed chapter 11

petitions on May 21, 2001, and confirmed a plan in September 2002.  The plaintiff was

appointed as the Representative of the Unsecured Creditors for the purpose of pursuing

chapter 5 causes of action and objecting to claims.  The relevant provisions of the Plan,

and the Representative's powers and duties, are discussed in detail in In re Teligent, Inc., 306 B.R. 752, 755-56 (Bankr. S.D.N.Y. 2004).

The plaintiff commenced this adversary proceeding on April 25, 2003. The initial complaint (ECF Doc. # 1) sought to avoid and recover preferences aggregating approximately $40,000. The preference claim is separate from the fraudulent transfer claim, but was tried at the same time. It is discussed below.

The plaintiff thereafter filed an amended complaint (ECF Doc. # 2) that asserted a claim to recover the original $15 million loan,[3] primarily on the theory that it was a constructive fraudulent conveyance. In Mandl I, the Court addressed the parties' competing motions for summary judgment. It concluded, in relevant part, that the forgiveness of the $12 million loan, through the combination of the termination "other than for Cause" and the separate release in the Separation Agreement, constituted a transfer for the purpose of the plaintiff's avoidance claim. 325 B.R. at 87. The Court observed, however, that the value of the transfer was open to question. In particular, the circumstances suggested that Mandl might have been entitled to resign for Good Reason, or, possibly, that IDT's takeover triggered the Change of Control provisions under the Employment Agreement. Id. at 88.[4] In Mandl II, the Court granted reargument, but

---

[3]    The amended complaint ignored the fact that 20% of the $15 million loan had already been forgiven under the 1998 letter amendment. The reduction was acknowledged in the next amended complaint. (See ECF Doc. # 23.)

[4]    A "Change in Control" occurred if a third party (i.e., someone other than the original shareholders, their affiliates or Mandl) acquired more than 50% of the voting interests or the majority of the Teligent board consisted of a third party's designees. (DX A at ¶ 8(b).) Mandl does not contend that the "Change in Control" provisions were triggered, although he does contend that as a factual matter, IDT took over the control of Teligent.

adhered to its original decision.  In <u>Mandl III</u>, the Court denied the plaintiff's motion to

amend her complaint yet again to assert a cause of action for an actual fraudulent transfer.

## DISCUSSION[5]

### A.    The Fraudulent Transfer Claim

#### 1.    Constructive Fraud

##### a.  Introduction

The gravamen of the plaintiff's main claim is that Teligent committed a

constructive fraudulent transfer, under bankruptcy and applicable Virginia law,[6] when it

released Mandl from the obligation to repay the $12 million loan.  Section 548(a)(1)(B)

of the Bankruptcy Code states, in pertinent part:

> The trustee may avoid any transfer of an interest of the debtor in
> property . . . that was made or incurred on or within one year before the
> date of the filing of the petition, if the debtor . . . received less than a
> reasonably equivalent value in exchange for such transfer . . . and. . . . was
> insolvent on the date that such transfer was made . . . or became insolvent
> as a result of such transfer . . . .

Virginia Code § 55-81, made applicable by 11 U.S.C. § 544(b), states in relevant part:

> Every . . . transfer . . . which is not upon consideration deemed
> valuable in law . . . by an insolvent transferor, or by a transferor who is
> thereby rendered insolvent, shall be void as to creditors whose debts shall
> have been contracted at the time it was made, but shall not, on that account
> merely, be void as to creditors whose debts shall have been contracted or
> as to purchasers who shall have purchased after it was made.

---

[5]      The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended several of the
provisions of the Bankruptcy Code discussed in this opinion.  The 2005 amendments do not apply to these
2001 chapter 11 cases or this adversary proceeding, and all statutory references are to the Bankruptcy Code
in effect when the chapter 11 cases were filed.

[6]      Teligent maintained its headquarters in Virginia.  The plaintiff also invoked the law of Delaware,
the state of Teligent's incorporation, but Delaware law does not apply to the plaintiff's fraudulent transfer
claim.  Under New York's choice of law rules, the law of the state where the injury was inflicted governs,
and that is usually where the plaintiff is located.  <u>Drenis v. Haligiannis</u>, 452 F. Supp. 2d 418, 427 (S.D.N.Y.
2006).  As noted, Teligent was located in Virginia.

State law governs the burden of proof on the plaintiff's claim under § 544(b).

Daly v. Deptula (In re Carrozzella & Richardson), 286 B.R. 480, 485 (D. Conn. 2002);

Glinka v. Bank of Vt. (In re Kelton Motors, Inc.), 130 B.R. 170, 182 (Bankr. D. Vt.

1991). Federal law governs the burden of proof on the § 548 claim. See Kelton Motors,

130 B.R. at 178-79. The allocation of the burden is the same under either law. The

trustee must prove a constructive fraudulent transfer by a preponderance of the evidence.

Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.), 232 B.R. 565,

570 (Bankr. N.D.N.Y. 1999)(bankruptcy law); Durso Supermkts., Inc. v. D'urso (In re

Durso Supermkts., Inc.), 193 B.R. 682, 696 (Bankr. S.D.N.Y. 1996)(same); see Bernstein

Bros. Mgmt. v. Miller, No. 145554, 1997 WL 1070460 at *5 (Va. Cir. Feb. 11,

1998)(Virginia law). Once the plaintiff makes out a prima facie case, the burden of going

forward to rebut the prima facie case shifts to the defendant. Levy v. Kindred, 854 F.2d

682, 685 (4th Cir. 1988)(Virginia law); Balzer & Assocs., Inc. v. Lakes on 360, Inc., 463

S.E.2d 453, 457 (Va. 1995)(Virginia law); see Braunstein v. Walsh (In re Rowanoak

Corp.), 344 F.3d 126, 131 (1st Cir. 2003)(bankruptcy law).[7]

Although the allocation of the burden is the same, Virginia law nevertheless

imposes a more rigorous standard on one seeking to avoid a constructively fraudulent

transfer. "[T]he consideration does not have to be reasonably equivalent to what is being

given up." Schnelling v. Crawford (In re James River Coal Co.), 360 B.R. 139, 167

(Bankr. E.D. Va. 2007); see Moore v. Manson (In re Springfield Furniture, Inc.), 145

B.R. 520, 533 (Bankr. E.D. Va. 1992)("The phrase 'consideration deemed valuable in

---

[7]       The plaintiff contends that Mandl was an insider, and bore a greater burden. In light of the
disposition of the case, it is not necessary to decide this question.

law' refers to <u>any</u> valuable consideration received by the transferor."(<u>quoting</u> § 55-81)).

Since Mandl waived his future employment benefits when he entered into the Separation

Agreement, he may have surrendered enough value to provide a defense to the Virginia

state law claim.  Accordingly, I will focus on the plaintiff's constructive fraudulent

transfer claim under 11 U.S.C. § 548.

### b.    The Evidence at Trial

The plaintiff had to prove that Teligent transferred property to Mandl, while it

was insolvent, for less than reasonably equivalent value.  <u>Mandl I</u>, 325 B.R. at 86.  The

Court previously determined that the discharge of the repayment obligation was a

"transfer," <u>id.</u> at 87, and Mandl conceded that Teligent was insolvent at the time of the

transfer.  Accordingly, the only open issue was whether Mandl gave reasonably

equivalent value for what he got.

The plaintiff demonstrated, in her direct case, that Teligent surrendered an

ostensible $12 million claim,[8] and did not receive anything in return except for Mandl's

termination (and the release of any further obligations to Mandl under the Employment

Agreement).  Mandl never contended that the benefits he surrendered were reasonably

equivalent in value to the forgiveness of the $12 million loan.  Mandl also delivered a

release to Teligent, but there was no evidence that he held any other claims against

Teligent, and he never contended that he did.  Consequently, plaintiff established a prima

facie case, and the burden shifted to Mandl to show that he gave reasonably equivalent

value in exchange for the forgiveness of his $12 million obligation.

---

[8]    Teligent also released Mandl from his covenant not to compete (DX C at ¶ 6), and agreed to reimburse his legal fees up to a maximum of $25,000.  (<u>Id.</u> at ¶ 9.)

Mandl failed to sustain this burden.  At trial, he testified, in substance, that he was stripped of his authority and forced out by Jonas, the new chairman of the board installed by IDT.  If true, Jonas' actions on behalf of Teligent would have violated paragraph 3 of the Employment Agreement, and allowed Mandl to resign for Good Reason.  At that point, Mandl could have resigned and discharged the $12 million obligation under the terms of the Employment Agreement.  Although he did not provide the notice and an opportunity to cure, Teligent excused the condition by entering into the Separation Agreement and terminating Mandl other than for Cause.  Under this scenario, the $12 million loan was uncollectible at the time of the Separation Agreement, and the release of the obligation transferred zero value to Mandl.

The different version Mandl gave during the Interview leads to a different conclusion.  Initially, Mandl objected in his post-trial submissions to the receipt of the Brosowsky deposition and the Interview on the ground that they were inadmissible hearsay.  (Defendant's Objections to Plaintiff's Proposed Findings of Fact, dated Aug. 13, 2007, at 6)(ECF Doc. # 151.)  At trial, however, Mandl did not raise a hearsay objection to the deposition transcript (or the Interview that was attached as an exhibit to the deposition transcript), and instead, reserved his right to raise "substantive objections to Mr. Berzowski's [sic] competency to testify about . . . the article."  (See Tr. at 91-93.)  In addition, another copy of the Interview was included as part of the Affidavit of Alex Mandl, sworn to May 29, 2007, (PX 55 at Ex. A, GEMALTO 00012-18), and Mandl consented to its admission.  (Id. at ¶ 5.)  Accordingly, all objections to the Interview are overruled, and Mandl's rights are limited to the right to object to specific questions at his deposition.

The same result follows under Fed. R. Civ. P. 32(a), which, at the time of the trial,[9] stated:

> (a) *Use of Depositions.* At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> . . . .
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> . . . .
>
> (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition; or
>
> . . . .
>
> (D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

Mandl's counsel attended the deposition and cross-examined Brosowsky. At the time of the deposition, Brosowsky lived and worked in Washington, D.C. (PX 19 at 6-7.) The plaintiff implied at the trial that he still does, and represented that he refused to appear voluntarily. (<u>See</u> Tr. at 91-92.) Accordingly, the contents of the deposition are admissible (or inadmissible) to the same extent as if Brosowsky had testified in person at the trial.

Brosowsky did not specifically recall the details of the Interview. He testified, however, that his practice was to record an entire interview, and then have the recorded interview transcribed. (PX 19 at 11-12.) If he edited the interviewee's statements in the

---

[9]  Rule 32 of the Federal Rules of Civil Procedure was restyled, effective December 1, 2007.

published interview, he indicated changes with ellipses or brackets.  (Id. at 13.)

Brosowsky identified the Interview as the one he wrote.  (Id. at 13-14.)

The Court is satisfied that the Interview reflected an accurate transcription of

Mandl's remarks.  In fact, Mandl never testified that it was inaccurate.  The net effect is

that Brosowsky testified about what Mandl said, and Mandl's statements during the

Interview are admissible either as a non-hearsay admission, FED. R. EVID. 801(d)(2), or

as a recorded recollection.  FED. R. EVID. 803(5).

Mandl told Brosowsky that prior to IDT, he had discussed resigning with some of

the directors, and had been waiting for the right moment.  The right moment occurred

when IDT entered the picture.  At that point, Mandl tendered his resignation, and IDT

gladly accepted it.  Mandl did not state or imply to Brosowsky that he was stripped of his

authority or forced to resign, or that if he refused to resign, he would have been fired.

Under this version, he had no Good Reason to resign, and the Notes would have been due

and owing but for the Separation Agreement.

I find that Mandl gave a more credible account during the Interview.  It was

published no more than three months after the event, when it was fresher in Mandl's

mind.  In addition, Mandl gave the Interview before this lawsuit, which may have

affected his recollection of what occurred.  Moreover, Mandl never denied what was

attributed to him during the Interview, or suggested that he gave an inaccurate account of

the circumstances surrounding the termination of his employment at that time.  Rather, he

ignored the Interview and told a different tale at trial.  I infer from the evidence that the

statements made during the Interview on this issue were truthful and correct.

The Interview was consistent, in this regard, with another account that Mandl gave approximately one year later. In August 2002, Gemplus, S.A. hired Mandl as its CEO. According to a release issued by Gemplus on or about August 29, 2002 (see PX 55 at GEMALTO 00004), the Teligent Board rejected Mandl's funding plan, which was in place before the capital markets collapsed. Mandl resigned because of the rejection and before Teligent "went under." Mandl stipulated to the admission of the Gemplus release for use in connection with this adversary proceeding. (PX 55 at ¶ 5.)

Furthermore, portions of Mandl's trial account conflicted with other evidence. For example, he testified that after his meeting with Jonas, he picked up, left and never returned to Teligent. Mandl believed the meeting with Jonas occurred on April 18, 2001, but it probably occurred one or two days later.[10] The plaintiff offered evidence, however, that Mandl flew to Newark on April 26, 2001, and sought reimbursement from Teligent for his airfare. (See PX 8 at Employee Long Distance Travel Expense Report Form, dated May 1, 2001.) No evidence was offered regarding the nature or purpose of the trip, but Mandl was in the best position to explain why he was billing Teligent for travel expenses after he had left the company.

Mandl also gave inconsistent testimony at his May 4, 2006 deposition. He stated (twice) that Teligent had not violated the Employment Agreement during his tenure. (PX

---

[10]    Mandl was in Jackson, Mississippi on April 18, 2001. (PX 8 at Employee Long Distance Travel Expense Report Form, dated May 1, 2001.) Jonas and the other IDT/Liberty nominees were elected to the Teligent Board on April 19th. In addition, Mandl and other Teligent officers participated in a conference call with Harvey R. Miller, Esq., of Weil, Gotshal & Manges, LLP, on April 19th. (PX 54, Ex. A at Time Card.)

24 at 178.)[11]  Stripping him of his offices without cause would have breached paragraph 3 of the Employment Agreement, which granted Mandl the power and authority of a CEO.  In fact, he now contends that Jonas' decision to terminate his employment formed the basis of his right to resign for Good Reason.

In short, I reject Mandl's version at trial.  As a result, there is no credible evidence that IDT forced Mandl out, or that Teligent committed any of the breaches listed in paragraph 6(d) of the Employment Agreement.  Thus, Mandl did not have Good Reason to resign and Teligent's decision to terminate Mandl other than for Cause, coupled with the release in the Separation Agreement, discharged a valid, $12 million obligation.  In essence, the form of the termination was a $12 million gift.  The outcome would be the same if there had been no Employment Agreement, Mandl owed Teligent $12 million, and Teligent released Mandl from the obligation to repay the debt.  Accordingly, the transfer – the release of the loan obligation – will be avoided under § 548.[12]

### 2.    Actual Fraud

The plaintiff also argued that the release of the $12 million loan constituted an intentional fraudulent transfer.  Virginia Code Annotated, § 55-80 states:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of

---

[11]    Although PX 24 was not received into evidence, as stated in note 1, infra, the parties had an opportunity to designate portions of deposition testimony, and submit objections to the other party's designated testimony.

[12]    This conclusion moots the plaintiff's contention that each annual installment of loan forgiveness, as restructured under the Separation Agreement, also constituted a fraudulent transfer.  She asserted this position in her post-trial submissions, and in a separate adversary proceeding brought against Mandl.  (See Adv. Proc. # 07-01691.)  The plaintiff is directed to submit an order dismissing the second adversary proceeding.

or from what they are or may be lawfully entitled to shall, as to such
creditors, purchasers or other persons, their representatives or assigns, be
void. This section shall not affect the title of a purchaser for valuable
consideration, unless it appear that he had notice of the fraudulent intent of
his immediate grantor or of the fraud rendering void the title of such
grantor.

Similarly, § 548(a)(1)(A) of the Bankruptcy Code provides:

The trustee may avoid any transfer of an interest of the debtor in
property, or any obligation incurred by the debtor, that was made or
incurred on or within one year before the date of the filing of the petition,
if the debtor voluntarily or involuntarily –

(A) made such transfer or incurred such obligation with actual
intent to hinder, delay, or defraud any entity to which the debtor was or
became, on or after the date that such transfer was made or such obligation
was incurred, indebted.

Under Virginia law, the plaintiff must prove an actual intent to defraud by clear and

convincing evidence. Coleman v. Cmty. Trust Bank, N.A. (In re Coleman), 299 B.R.

780, 795 (W.D. Va. 2003), aff'd in part and rev'd in part on other grounds, 426 F.3d 719

(4th Cir. 2005); McClintock v. Royall, 4 S.E.2d 369, 372 (Va. 1939). There is a split

regarding the level of proof needed to show actual fraud under 11 U.S.C. § 548(a)(1)(A).

Compare Kelton Motors, 130 B.R. at 178 (clear and convincing standard), with

Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.), 168 B.R. 408, 418 (Bankr.

D. Ariz. 1994)(preponderance of the evidence standard).

The Court denied the plaintiff's motion to amend the complaint to assert an actual

fraudulent transfer claim, Mandl III, 346 B.R. 73, but the plaintiff apparently pursued it

anyway and now claims that she proved it at trial. She failed, however, even under the

more lenient burden of proof. Her position is based on the supposition that Mandl used

his position to foist the loan forgiveness on Teligent at a time when he knew it was

insolvent and headed toward bankruptcy.  (See Plaintiff's Proposed Conclusions of Law, dated July 13, 2007, at 7)(ECF Doc. # 147.)

The evidence did not support the plaintiff's theory.  The Separation Agreement, which effected the release, was negotiated at arms-length between Mandl and Teligent. By then, Jonas and IDT were firmly in charge of Teligent.  When the Separation Agreement was signed in May, Yoav Krill had replaced Mandl, Mandl did not have any influence over Teligent's willingness to enter into the Separation Agreement, and he was represented by his own counsel.  Furthermore, Stuart Kupinsky, Teligent's general counsel, signed the Separation Agreement on Teligent's behalf.  Although Kupinsky had been working in Teligent's legal department, he was promoted to general counsel after IDT took over.  See note 13, infra.  Nothing suggests that he owed any allegiance to Mandl, or was subject to his domination or control.

Accordingly, even if Mandl had an evil state of mind – and I do not find from the evidence that he did – his state of mind would not be attributed to Teligent.  The record does not reflect any other evidence implying that Teligent intended to defraud its creditors.  Rather, I infer from the evidence that IDT, which had assumed control of Teligent, made the business judgment that it was worth canceling Mandl's $12 million debt to get rid of him.[13]

---

[13]    In fact, Teligent's four other incumbent senior executives also departed around the time that IDT took over.  Steven F. Bell, the Senior Vice President of Human Resources, and Peter T. Garahan, the Vice-Chairman and Chief Financial Officer, resigned on May 2, 2001.  (TELIGENT, INC., ANNUAL REPORT (FORM 10-K/A), at F-21 (May 23, 2001).)  Laurence Harris resigned his position as General Counsel and Secretary of Teligent on May 7, 2001, and was replaced by Kupinsky.  (Id. at F-22.)  Finally, Hamid Akhavan "was removed" as Senior Vice President of Information Technology and Chief Technology Officer on May 10, 2001.  (Id.)  These departures implied an effort by IDT to bring in its own people to run Teligent.

### 3.    The Recovery Under § 550

We turn now to the question of the plaintiff's recovery.  Section 550(a) provides:

> Except as otherwise provided in this section, to the extent that a transfer
> is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this
> title, the trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property, from . . .
> the initial transferee....

The Court must, therefore, determine the value of the avoided release.  Ordinarily, the trustee could recover the value of the amount of the released loan.  See Shear v. Seminara (In re PSI Indus., Inc.), 306 B.R. 377, 388-89 (Bankr. S.D. Fla. 2003).  In essence, avoiding the release strips the transferee of his affirmative defense, and leaves the transferor free to enforce the underlying debt.  Here, however, the Plan gave the plaintiff the chapter 5 causes of action, and vested the other assets, including contract claims, in Reorganized Teligent.  Mandl II, 325 B.R. at 138.  Neither the Notes nor the underlying contract claim were transferred to the plaintiff.  Hence, the plaintiff cannot avoid the release, and prosecute a state law contract action.  Mandl I, 325 B.R. at 88 n.7.  Furthermore, the Court previously rejected the argument that the plaintiff could recover the debt under 11 U.S.C. § 542(b).  Mandl II, 325 B.R. at 137-38.[14]

I nevertheless conclude that the plaintiff is entitled to recover the amount of the released obligation.  The fraudulent transfer provisions of the Bankruptcy Code are intended to allow a trustee to recover property that would otherwise have been available

---

[14]    Undaunted, the plaintiff now argues that once she avoids the release, the Notes will be "due and payable," and she can proceed under § 542(b), either in this lawsuit or through a new action.  The Court previously ruled that the plaintiff could not bring an action on the Notes under either § 542(b) or the common law.  Her two-step approach would circumvent these earlier rulings, and seemingly contravene the law of the case.  In light of the disposition of the lawsuit, it is not necessary to rule definitively on the question.

to the estate and its creditors.  See Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 195

(S.D.N.Y. 2002)("As we noted above, the purpose of § 548(a)(1)(A) is to prevent the

debtor from 'placing assets beyond the reach of creditors' by removing them from the

estate with the intent to hinder, delay, or defraud his creditors."); Buchwald v. Di Lido

Beach Resort, Ltd. (In re McCann, Inc.), 318 B.R. 276, 282 (Bankr. S.D.N.Y. 2004)("A

trustee can only avoid and recover 'property that would have been part of the estate had it

not been transferred before the commencement of bankruptcy proceedings.'")(quoting

Begier v. Internal Revenue Serv., 496 U.S. 53, 58 (1990)).  But for the release, the loan

would have been an asset available for distribution to the creditors.

The granting of the release was the equivalent of the transfer of a $12 million

cause of action.  As with any successful avoidance action, the plaintiff can recover the

transferred asset or its value.  The recovery of the cause of action to collect the loan

effectuates § 550(a), and provides the unsecured creditors with the value taken from

Teligent through the transfer.  Furthermore, Mandl never argued that Mandl had other

defenses, or that the loan was uncollectible or valueless except for the Separation

Agreement.  Finally, this conclusion does not deprive Reorganized Teligent of anything

of value because all that revested in Reorganized Teligent was a contract claim subject to

the complete defense of release.

Accordingly, the plaintiff is entitled to recover a judgment on her constructive

fraudulent transfer claim in the amount of $12 million.  Ordinarily, she should also be

entitled to recover prejudgment interest from September 1, 1997 at the rate set forth in the

Notes,[15] because the value of the released cause of action includes contract interest. As

noted, however, she failed to prove the appropriate interest rate. Absent that evidence,

there is no basis to compute the appropriate amount of interest. Consequently, no interest

can be recovered.

**B.      Preference Claim**

    **1.      The Plaintiff's Prima Facie Case**

The plaintiff also seeks to recover transfers in the approximate sum of $40,000,

which Teligent paid to Mandl within 90 days of the petition date. Section 547(b) sets

forth the elements of a preference claim:

> (b) Except as provided in subsections (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property -
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made -
>>
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if -
>>
>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

---

[15]      The interest that accrued between September 1, 1996 and August 31, 1997 was released under the 1998 letter amendment.

Mandl conceded that he received five separate transfers from Teligent, aggregating $40,105.40, within 90 days of the petition date as reimbursement for antecedent business expenses.  (See Defendant's Supplemental Proposed Findings of Fact, dated Nov. 14, 2007, at ¶¶ 1, 4.)  Furthermore, he did not challenge the statutory presumption that Teligent was insolvent at the time of each transfer.  See 11 U.S.C. § 547(f).  Instead, he argues that the plaintiff failed to prove the fifth element.

To satisfy § 547(b)(5), the plaintiff must prove that the transferee received more as a result of the preference than if the preference was never paid, and instead, the transferee received a distribution on its claim in a hypothetical chapter 7 case.  The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date.  Taunt v. Fidelity Bank of Mich. (In re Royal Golf Prods. Corp.), 908 F.2d 91, 95 (6th Cir. 1990); see Hassett v. Goetzmann (In re CIS Corp.), 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996); cf. Palmer Clay Prods. Co. v. Brown, 297 U.S. 227, 229 (1936)(construing the provisions of the former bankruptcy act).  The analysis should include the cost of administering the hypothetical chapter 7 case, see McColley v. Navaro Gem Ltd. (In re Candor Diamond Corp.), 68 B.R. 588, 595 (Bankr. S.D.N.Y. 1986), and disregard all other post-petition expenses, liens and priorities.  See Neuger v. United States (In re Tenna Corp.), 801 F.2d 819, 823 (6th Cir. 1986).  As a practical matter, this element is satisfied whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution.  Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.), 778 F.2d 1416, 1421 (9th Cir. 1985); CIS Corp., 195 B.R. at 262 (citing cases); Candor Diamond Corp., 68 B.R. at 595.

**22**

The plaintiff did not, at first, propose any specific findings relating to this element.  After Mandl challenged her proof, she referred the Court to certain exhibits (the Plan, Disclosure Statement, Confirmation Order, monthly operating reports, and Statement of Financial Affairs Rider 23 and Rider 23.2), (see Plaintiff's Reply and Proposed Counter-Conclusions of Law, dated Sept. 10, 2007, at 20 (ECF Doc. # 154)), but failed to construct a hypothetical chapter 7 case.  Furthermore, the referenced exhibits reflected post-petition expenses, priorities and liens, and hence, did not prove what the distribution would have been as of the petition date.

The Insolvency Report prepared by Alan R. Barbee, (PX 44), however, supplied the missing proof.  After recounting his analysis and the data he reviewed, Barbee opined that the debtor was insolvent, inter alia, on May 21, 2001, the petition date (PX 44 at 14), and hence, Teligent lacked sufficient assets to make a 100% distribution to its general unsecured creditors.  The latter class would have included Mandl's expense reimbursement claim if it had not been paid before then.  Moreover, Barbee opined that the transfer allowed Mandl to receive more than he would have received in a hypothetical chapter 7 case if the transfers had not been made, and instead, he received a distribution on his claim pursuant to the Bankruptcy Code.[16]  (Id.)

The Insolvency Report satisfied the plaintiff's initial burden of going forward under § 547(b)(5), and shifted the burden of going forward to Mandl.  Mandl failed to

---

[16]    The Insolvency Report did not actually mention Mandl by name.  The plaintiff filed approximately 1,000 preference claims, and apparently commissioned a generic insolvency report that could be used in each adversary proceeding.  Barbee's ultimate conclusions regarding insolvency and the "greater than" distribution test under § 547(b)(5) applied equally in all of the cases.

adduce any contrary evidence on the question, and the plaintiff, therefore, satisfied her

burden of ultimate persuasion under § 547(b).

### 2.      Mandl's Ordinary Course Defense

Mandl contends that the transfers are nevertheless immune from avoidance under

§ 547(c)(2), the ordinary course of business defense, which states:

> The trustee may not avoid under this section a transfer . . . to the
> extent that such transfer was - (A) in payment of a debt incurred by the
> debtor in the ordinary course of business or financial affairs of the debtor
> and the transferee; (B) made in the ordinary course of business or financial
> affairs of the debtor and the transferee; and (C) made according to
> ordinary business terms.

According to the legislative history, "the purpose of [section 547(c)(2)] is to leave

undisturbed normal financial relations, because it does not detract from the general policy

of the preference section to discourage unusual action by either the debtor or his creditors

during the debtor's slide into bankruptcy."  H.R. Rep. No. 95-595, at 373 (1977); S. Rep.

No. 95-989, at 88 (1977); Official Comm. of Unsecured Creditors of Cyberrebate.com,

Inc. v. Gold Force Int'l, Ltd. (In re Cyberrebate.com, Inc.), 296 B.R. 639, 642 (Bankr.

E.D.N.Y. 2003), aff'd, No. 03 CV 5982(JG), 2004 WL 287144 (E.D.N.Y. Feb. 10, 2004).

In determining whether a transfer is made in the ordinary course of business, a court may

consider (i) the prior course of dealing between the parties, (ii) the amount of the

payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the

presence of unusual debt collection practices, and (vi) changes in the means of payment.

See Cyberrebate.com, Inc., 296 B.R. at 642;  Cassirer v. Herskowitz (In re Schick), 234

B.R. 337, 348 (Bankr. S.D.N.Y. 1999).  The date of the transfer of a payment by check,

under § 547(c)(2), is generally the date that the check is delivered.  124 Cong. Rec.

H11,097 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17,414 (daily ed. Oct. 6, 1978);

Young v. Cont'l Worsteds, Inc. (In re Wingspread Corp.), 120 B.R. 8, 11 (Bankr.

S.D.N.Y. 1990).  The defendant bears the burden of proving the defense by a

preponderance of the evidence.  Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78

F.3d 30, 39 (2d Cir. 1996); see 11 U.S.C. § 547(g).

　　　　Mandl's trial testimony regarding this defense was very brief.  He stated that

employees were encouraged to seek reimbursement on a monthly basis for their prior

month's expenses.  (See Tr. at 169-70.)  Employees generally submitted their

reimbursement requests every month or every other month, depending on whether they

were traveling.  (Tr. at 165, 170.)  The expenses were summarized in an expense report,

signed by the employee's manager or supervisor, and submitted for reimbursement.  (Tr.

at 165.)  The Chief Financial Officer approved Mandl's expense reports.  (Tr. at 168.)

Employees received their reimbursement checks in a matter of days, usually between five

and ten.  (Tr. at 174-75.)  During the period that Mandl was president and chief operating

officer at AT&T from 1990 to 1996, AT&T followed the same policy.  (Tr. at 170-72.)

　　　　Mandl's testimony addressed Teligent's (and AT&T's) reimbursement policies,

but did not refer to any specific payment or expense placed in issue by his defense.  The

only other evidence pertaining to the transfers and payments was contained in PX 8, to

which Mandl cited in his post-trial proposed findings of fact.  (Defendant's Proposed

Findings of Fact, dated Aug. 13, 2007, at ¶ 12 ("Within 90 days prior to the filing of

Teligent's chapter 11 petition for relief, Mandl received $40,000 in payments (the

"Transfers") from Teligent representing reimbursement of out-of-pocket expenses

incurred by Mandl in the ordinary course of his duties with Teligent. (Ex. 8).")(ECF Doc.

# 150.)  PX 8 consisted of approximately 350 pieces of paper relating to transfers and

**25**

expenses dating back to late 1999.  The pages were unnumbered and, except for the

checks comprising the transfers, which appeared at the beginning of the exhibit, were in

no particular order.  In addition, some of the pages included photocopies of invoices or

charge slips relating to more than one expense.[17]

Mandl's reference to PX 8, without more, cast the burden on the Court to find

the documentary support for his ordinary course defense.  However, "[j]udges are not

pigs, hunting for truffles buried in briefs."  United States v. Dunkel, 927 F.2d 955, 956

(7th Cir. 1991); accord Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys., 309 F.3d

433, 436 (7th Cir.  2002), cert. denied, 539 U.S. 941 (2003).  A court is entitled to the

assistance of counsel in marshaling the evidence, and is not required to paw through a

mass of documents to determine if the litigant has supported his claim.  Albrechtsen, 309

F.3d at 436; Gallimore-Wright v. Long Island R.R. Co., 354 F. Supp. 2d 478, 488

(S.D.N.Y. 2005); In re Schwartz, 366 B.R. 265, 267 (Bankr. D. Mass. 2007)(quoting

McGraw v. Allen (In re Bell & Beckwith), 64 B.R. 620, 635 (Bankr. N.D. Ohio 1986));

In re BAJ Corp., 42 B.R. 595, 597-98 (Bankr. D. Conn. 1984).

Consequently, I directed Mandl to match the payments at issue with the

corresponding documents and submit supplemental proposed findings.  (E-mail from

Jessica D. Lubarsky to Denise Savage, dated Oct. 30, 2007)(ECF Doc. # 158.)  In

response, Mandl produced the following chart:

---

[17]    Because Mandl conceded all of the elements of the plaintiff's affirmative case, except for the fifth
element, the plaintiff did not have to refer to any of the documents in PX 8.

| CHECK NUMBER | PAYMENT DATE | REIMBURSEMENT REQUEST DATE | REIMBURSEMENT AMOUNT | DAYS FROM REQUEST TO PAYMENT |
|---|---|---|---|---|
| 319939 | 2/14/01 | 1/10/01 | $2,535.50 | 35 |
| | | 1/10/01 | $ 153.32 | 35 |
| | | 1/10/01 | $ 287.74 | 35 |
| | | 1/10/01 | $ 8.25 | 35 |
| | | 1/10/01 | $ 12.00 | 35 |
| | | 1/10/01 | $ 20.00 | 35 |
| | | 1/18/01 | $3,089.56 | 27 |
| 320439 | 3/1/01 | 1/3/01 | $ 529.15 | 56 |
| | | 1/3/01 | $ 142.00 | 56 |
| | | 1/30/01 | $2,060.84 | 29 |
| | | 1/30/01 | $2,775.17 | 29 |
| 321340 | 4/3/01 | 2/2/01 | $ 965.50 | 60 |
| | | 2/2/01 | $ 185.50 | 60 |
| | | 2/2/01 | $ 103.79 | 60 |
| | | 2/7/01 | $ 165.25 | 55 |
| | | 2/7/01 | $ 142.00 | 55 |
| | | 2/7/01 | $1,113.94 | 55 |
| | | 2/19/01 | $3,789.25 | 43 |
| | | 2/19/01 | $ 115.37 | 43 |
| | | 3/9/01 | $3,505.59 | 25 |
| | | 3/9/01 | $2,826.25 | 25 |
| | | 3/20/01 | $2,158.76 | 14 |
| 321796 | 4/19/01 | 3/13/01 | $ 791.41 | 37 |
| | | 3/16/01 | $ 317.00 | 34 |
| | | 3/16/01 | $ 146.00 | 34 |
| | | 3/16/01 | $ 303.00 | 34 |
| | | 3/16/01 | $5,000.00 | 34 |
| 321941 | 5/2/01 | 4/4/01 | $2,108.03 | 28 |
| | | 4/4/01 | $ 237.15 | 28 |
| | | 4/4/01 | $ 794.48 | 28 |
| | | 4/4/01 | $ 58.29 | 28 |
| | | 4/4/01 | $ 5.40 | 28 |

| | | 4/11/01 | $ 86.25 | 21 |
|---|---|---|---|---|
| | | 4/11/01 | $ 819.95 | 21 |
| | | 4/26/01 | $2,753.71 | 6 |
| | | | **$40,105.40** | |

(See Defendant's Supplemental Proposed Findings of Fact, dated Nov. 14, 2007, at ¶ 4)(ECF Doc. # 159.)[18]

The chart did nothing to resolve the difficulty that led to my requesting it in the first place. It essentially reiterated a spreadsheet that appeared at the very beginning of PX 8, recasting it in a more readable form. Like the spreadsheet, it purported to summarize the underlying expenses and reimbursements, but Mandl did not attach or point to any underlying invoice, bill, credit card slip or reimbursement request. Nor did the chart or anything else in the submission indicate when the underlying expense was incurred. In order to determine if the chart accurately summarized the relevant documents, I would have to sift through 350 pages to locate them. Furthermore, even that task would not tell me whether a particular expense was incurred in Teligent's and Mandl's ordinary course of business or financial affairs. See 11 U.S.C. § 547(c)(2)(A).

The chart was also inaccurate. It incorrectly used the date of the check as the payment or transfer date, information vital to the § 547(c)(2) defense. The check date, however, is irrelevant under § 547(c)(2). Instead, the transfer occurs when the check is delivered to the transferee, provided that it is honored within 30 days of delivery. See Durham v. Smith Metal & Iron Co. (In re Cont'l Commodities, Inc.), 841 F.2d 527, 530

---

[18]    The Plaintiff objected to its use because it was not received in evidence. (See Plaintiff's Supplemental Proposed Findings of Fact and Reply, dated Nov. 27, 2007, at ¶¶ 2-5)(ECF Doc. # 161.)  The chart was not offered as evidence and is not evidence; it merely attempted to organize the evidence. In theory, it was no different than the proposed findings of fact submitted by the parties.

(4th Cir. 1988)("a transfer of funds by check is effective [under § 547(c)(2)] on the date

that the creditor receives the check as long as the debtor's bank honors it within the 30-

day requirement of U.C.C. § 3-503(2)"); O'Neill v. Nestle Libbys P.R., Inc., 729 F.2d 35,

38 (1st Cir. 1984)(transfer [under § 547(c)(2)] deemed to occur on the delivery date

where the checks "were presented for payment within the 30-day period deemed

reasonable under the U.C.C. and were duly honored by the drawee bank."); Wingspread

Corp., 120 B.R. at 11 ("a transfer by check [under § 547(c)(2)] occurs on the date of

delivery, provided that the check is presented within approximately 30 days and not

dishonored.").

   In fact, an examination of the five checks suggested some unusual payment

practices. For example, check no. 320439, dated Mar. 1, 2001, was not paid until May 8,

2001, more than two months later. Furthermore, the transfer date occurred between three

and four months after the chart said reimbursement had been requested, and well beyond

the ordinary practice attested to by Mandl. In addition, check no. 321340, dated Apr. 3,

2001, was paid on May 9, 2001, more than 30 days later. In some cases, this was more

than three months after the reimbursement request. Finally, four of the five checks (other

than check no. 319939, dated Feb. 14, 2001) were cashed on May 8, 2001 or May 9,

2001, after Mandl testified he had terminated his employment with Teligent. These

included the two checks just discussed, and another check (no. 321796), dated Apr. 19,

2001.

   The evidence suggested that at least some of the checks were not delivered to

Mandl on the dates they were purportedly written, or if they were, Mandl inexplicably

delayed cashing them. Furthermore, as Mandl's termination date approached, the pace of

reimbursement quickened.  The April expenses were reimbursed within 30 days, and the

final April expense, incurred on April 26, 2001, was paid within two weeks.  The unusual

payment activity was never explained.

Mandl's proof suffered from at least one other significant shortcoming.  To prove

ordinariness, Mandl had to establish a "baseline of dealings," and show that the transfers

were consistent with the parties' prior course of dealings.  Schick, 234 B.R. at 348.

Mandl had worked at Teligent for nearly five years, and had undoubtedly submitted other

requests for reimbursement during his tenure.  Yet he did not show that the 90-day

payments were consistent, in terms of timing, with the reimbursements he received prior

to the preference period.  In short, Mandl wholly failed to prove his defense.

Accordingly, the plaintiff is entitled to recover the amount of the preference,

$40,105.40, under § 550(a).  She is also entitled to recover prejudgment interest on the

preference claim at the federal judgment rate in effect on the petition date, from the latter

date to the date that judgment is entered.  The award of prejudgment interest is

discretionary, and absent a sound reason to deny it, it should be awarded.  Hechinger Inv.

Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Del., Inc.),

489 F.3d 568, 579-80 (3d Cir. 2007); In re Milwaukee Cheese Wis., Inc., 112 F.3d 845,

849 (7th Cir. 1997).  Finally, the plaintiff is entitled to an award of costs and

disbursements to the extent set forth in Rule 54.1(c) of the Local Rules of the United

States District Courts for the Southern and Eastern Districts of New York.

The foregoing constitutes the Court's findings of fact and conclusions of law.

Settle judgment on notice.

Dated:  New York, New York
        January 3, 2008

                        /s/  *Stuart M. Bernstein*
                        STUART M. BERNSTEIN
                    Chief United States Bankruptcy Judge